————o————

## No. 3379.

### (Court of Appeal, Parish of Orleans.)

MARY E. HIGGINS, WIFE OF P. J. MOONEY, vs. SUCCESSION OF MRS. MADELINE V. ANDERSON.

Appeal from Civil District Court, Division "A."

Buck, Walshe & Buck, for Plaintiff and Appellee.

George L. Bright, for Defendant and Appellant.

This case involves a question of fact only and concerns the execution of a promissory note by the ordinary mark of a person who could write and sign her name. The suit was filed after the death of the alleged maker. The evidence of its execution and consideration is of a character that falls far short of proving the case with legal certainty.

MOORE, J. Plaintiff, claiming that she inherited from her deceased mother, Mrs. James Higgins, a certain promissory note dated at New Orleans, on the 18th day of September, 1897, payable four years after its date to the order of her said mother, for the sum of $1,500.00, with eight per cent. per annum interest thereon until paid, and purporting to be signed by Widow Madeline Anderson, whom it is alleged "could not write or sign her

426

name and executed said note by making her ordinary mark before two witnesses," sues the Succession of the alleged maker of said note, Widow Madeline Anderson, to recover the amount thereof.

The defense is a denial of signature and want of consideration. There was judgment for plaintiff and defendant appeals.

The note is shown to be in the handwriting of plaintiff's husband, and so also is the name of the alleged maker, "M. Anderson," and the words: "her mark;" between the latter is a sign, thus X, which it is alleged was affixed thereto by the hands of Mrs. Anderson.

No one signs the note as witnesses to this mark on the face of the note; and on the reverse of the note the name "M. Anderson" is also written by plaintiff's husband and to a cross mark thereto, two persons sign as witnesses, John Mealey, and J. M. Martin.

It is overwhelmingly established that the alleged maker of the note could not write and sign her name, and a number of writings were introduced in evidence showing that it was the invariable rule of Mrs. Anderson to sign her name to all writings requiring her signature.

Receipts given by her to various parties for rent coming to her from property owned by her and rented to others, which receipts run from December, 1896, to October, 1899, and *entirely written and signed* by her, are produced. They evidence the fact that she wrote a large, strong and firm hand. The size and formation of the letters as well as the firmness with which they are impressed on the paper, evidence rather a masculine than a feminine hand; and, if chirography may be taken as indicative of the steadiness, or unsteadiness, of nervous control of the writer of the documents referred to, it would be conclusive that nothing less than some very extraordinary event could so shock the nervous system of the possessor of such a handwriting as to render her incapable of signing her name.

427

It is likewise shown that the alleged maker of the note was, at the date of its execution, as she was at the time of her death, a woman of some means and the owner of several pieces of real estate in the City of New Orleans from which she was deriving a revenue. It is not pretended that she was at all embarrassed, nor is it shown that she had any need whatsoever for such a sum of money as is represented by the note; and it is made highly improbable that Mrs. Higgins, the payee named in the note, had any such sum to loan or that in fact she ever at any time owned or possessed the note or even saw it, or that it was ever claimed by her or transmitted from her estate to the plaintiff.

The tale which the plaintiff and her witnesses tell concerning the execution of the note and the alleged loan which it is claimed it was intended to represent, is, substantially, that Mrs. Anderson, accompanied by a young girl named Louisa ————————, called at the residence of Mrs. Higgins on the 18th day of September, 1897, between the hours of 11 o'clock a. m., and 12 o'clock m., where, by a singular co-incident, there was also gathered one J. M. Martin, one John Mealey, (confessedly an utter stranger to every person present or connected with the transaction except Martin, for whom he says he was working), and the husband of the plaintiff, who at this time was in the employ of the post-office department as a letter carrier; that without any preliminaries, Mrs. Anderson stated she wanted to borrow $1,500.00 of Mrs. Higgins; that the loan was promptly and at once made, Mrs. Higgins producing seven or eight hundred dollars in twenty dollar gold pieces and the balance in "greenbacks," and that they then and there delivered to Mrs. Anderson; that then a note was written out by plaintiff's husband payable four years after its date, without a word of discussion as to the period of maturity or the rate of interest to be paid; that the note was handed to Mrs. Anderson for her signature, who then affixed her mark thereto; that the reason she made her mark instead of signing her name was because at some period of

the transaction, about which the witnesses, as in other matters contradict themselves, as well as each other, Miss Louisa, or the "blonde lady" as she is usually referred to by the witnesses, was suddenly attacked with a "fit" or "spasm" which rendered Mrs. Anderson so nervous that she made her mark instead of signing her name. The severity of the young lady's illness, its duration, the particular and specific effect it had on Mrs. Anderson or on anyone else of those who were said to have been present and the reason why the transaction could not and was not postponed for a short while and until Mrs. Anderson's composure was restored, is not stated.

This peculiar, if not improbable and suspicious combination of events, is testified to by four witnesses, to-wit: the plaintiff; her husband; J. M. Martin and John Mealey.

The husband's testimony we at once reject. It was admitted by our esteemed brother of the lower court with the distinct understanding and reservation that it was to be considered only in the event that it would subsequently be shown that the witness, to quote from the ruling, "had some relation to the case within the exceptions provided by the statute." No such relation was shown, hence the husband was an incompetent witness. In this connection, however, we may say that in order to ascertain whether or not his own testimony might not show, as it has not shown by the other witnesses, that he was "within the exceptions provided by the statute," we read his testimony and that if it were considered at all, it would be only to place it in the same category as that of the other witnesses for plaintiff which we shall hereafter show is conflicting and self contradictory if not highly improbable.

The plaintiff's account of the transaction is that she was present at her mother's house between 11 o'clock a. m. and 12 o'clock M. on the 18th of September, 1897, when the loan was made

429

and the note executed. To the question by her counsel, "Were you present when the other two witnesses signed it (the note)," she answered, "Yes, sir"; then to the question: "Was John Mealey————," she replied before the question was completed: "No; he came in afterwards."

On cross-examination she testifies that the only other persons present at the transaction besides herself, Mrs. Higgins, Mrs. Anderson and the girl Louisa, were her husband and Martin.

"Q. You are sure nobody else was in the room except those you have named?

"A. That is all.

"Q. At the time, from the beginning of the paying of the money until after the signing of the note?

"A. That is all, sir."

At this point she is immediately taken in charge by her own counsel, and this is the result of the re-direct examination:

"Q. When did Mr. Mealey come in?

"A I expected him in.

"Q. I mean that day.

"A. He just happened in. I don't know exactly now again; no, I don't think he did—let me see.

"Q. Then he did not see any of the transaction?

"A. No, he didn't see anything—only the mark."

She says, however, that Martin was present during the whole transaction, and in response to a question provoking the reply, she adds:

"The way it came, there was a girl there kind of silly and she took a fit; her name was Louisa, and the old lady (Mrs. Anderson) got so excited she made a cross; my ma said, 'Do you think the cross answers for the signature?' and I said, 'It's the same as long as you have witnesses.'"

Later on she says that her mother asked, "Why can't she (Mrs. Anderson) sign her name?" thus showing that Mrs. An-

derson's nervous condition was not such as to impress, at least, Mrs. Higgins with the fact that it interfered with her ability to write her name. To this she said Mrs. Anderson replied, not that she was too nervous to write; but simply that "the sign of cross was just as good as the name." She says that this was all that was said by Mrs. Anderson or by any one else, although in almost the next breath she said that Mrs. Anderson made no remark at all about it.

"Q. You have stated, I believe, the reason she made her cross instead of signing her name?

"A. She made a cross, I said.

"Q. Did she not make a remark at the time she did it?

"A. No, sir; just made a cross."

Still pressed on cross-examination, she says that "everything was fixed" when the girl fell into a fit.

"Q. Everything had been done?

"A. Yes, sir.

"Q. You are sure of that?

"A. Yes, sir.

"Q. Then the reason that she made her mark was not because the girl got sick because she had already signed before she got sick?

"A. It was just between."

Still later she says that the execution of the note was "after she (Louisa) got through the spell she had." The note she finally said, "was ready to be signed," but just at that moment Louisa "got the spell."

She at first testifies that she knew nothing of the conversation between her mother and Mrs. Anderson leading up to the loan; that she was called in afterwards simply to see the money "counted out, to count it out to her."

"Then you do not know what happened between Mrs. Anderson and your mother before?

"A. No, sir, I don't know."

Subsequently she states that she *was* present in the room with her mother from the moment of Mrs. Anderson's arrival until the latter's departure, and she proceeds to give the conversation leading up to the alleged loan as follows:

"Mrs. Higgins," she said Mrs. Anderson said, "I would like to get some money from you." "My mother said: 'How much do you want, maybe I haven't as much as you want'; Mrs. Anderson said. Fifteen hundred dollars; my mother said, 'I believe I have that much,' and she said she would give it to her." She and her mother alone, with Mrs. Anderson and Louisa, were, she says, in the room together when this conversation took place. Then she says that it was she who received Mrs. Anderson, her mother being at the time in the kitchen with Martin, that she called her mother in and that it was her mother who informed her that Mrs. Anderson wanted to borrow some money, that her mother said to her, "Mary, Mrs. Anderson wants to borrow some money." "I said, 'how much?' she said, 'I don't know if I have as much as you want'; Mrs. Anderson said, 'fifteen hundred dollars,' *then* we called in Mr. Martin, who was there when it was given; so also was her husband at that time. Why Martin should be called in at this moment is not explained. Louisa had not yet had her "spell," nor was it yet known that Mrs. Anderson would subsequently become so nervous as to be unable to sign her name, therefore he could not have been called in to witness the affixing of Mrs. Anderson's mark to the note. Neither was he required for the purpose of preparing the note, for that service was performed by plaintiff's husband, who appeared on the scene earlier than Martin; nor was he needed to count the money, for the plaintiff says she was called in to perform this task. Nor can it be presumed that he was wanted as a witness to the delivery of the money to Mrs. Anderson as both the plaintiff and her husband sufficed for that purpose, and especially as it

appears that all parties had so much confidence in the integrity of Mrs. Anderson that there was not a moment's hesitation in acceding to her request for a loan of $1500 on her note made with a mark and not over her signature, although she was able to write and sign her name, and unsecured, notwithstanding she owned real property exceeding in value many times that amount; and, *mirabile dictu,* this confidence was so great that, without any solicitation therefor and not the slightest reference or suggestion being made as to the maturity of the loan, a note, maturing *four years* after its date, was made, which, by another singular coincidence, matured after the death of the girl Louisa, and shortly after the death of both Mrs. Higgins and Mrs. Anderson.

Martin's testimony is to the effect that he happened to go to Mrs. Higgins' house to borrow money; that he went back in the kitchen, that he met there the plaintiff, not her mother as testified by Mrs. Mooney; that he inquired "where is Pat?" meaning Mrs. Mooney's husband; that plaintiff answered, "he will he here in a minute." That subsequently he was called in the house by Mrs. Mooney to give his advice as to the legality of a note signed with a cross; that to this he replied: "anything is legal if you have enough witnesses;" that just then Mooney came in, and that then Mooney made out the note; that Mrs. Higgins *"went off* and got a black bag and *came out* and produced to Mrs. Anderson about seven or eight hundred dollars in twenty dollar gold pieces and the balance in paper, "which he says was delivered to Mrs. Anderson; that his advice was asked *before* the note was drawn up; and that he saw the girl in her fit, which singularly happened *just as he came in.* It will be remembered that Mrs. Mooney said it was she who said that the note thus signed would be good if made in the presence of witnesses; that it was her mother who was in the kitchen with Martin; that Louisa's fit happened after "everything was fixed," *including the drawing up of the note,* but not the signing; and that her mother *did not* go out of the room to get the money.

433

Continuing, Martin says that he called Mealey from the banquette into the house and asked him to be a witness to the signature, and that he (Mealey) "came and signed it and then went out on the steps again;" that the parties remained in the house an hour or more; that Mrs. Anderson's mark had been affixed by her on the face of the note before Mealey came in; that he saw Mrs. Anderson make her mark on the face of the note, that he never saw her make her mark on the back of the note: "I don't know what transpired when I moved from the table (after seeing Mrs. Anderson make her mark on the face of the note), whether the note was turned over by Mr. Mooney to be signed I couldn't say. I was only a witness on the face of the note. I never saw her sign on the back of the note. "Subsequently he said that Mealey was present when Mrs. Anderson made her mark *on the face of the note,* and that Mealey saw her do so. Later on we will see that Mealey denies this. He says that he cannot state what induced Mrs. Anderson to make the remark, which he says she made, that she was too nervous to sign her name, as no one had asked her to sign her name, unless it was because of the girl's fit; that Mealey was not acquainted with any person in the room but the witness, but that *after* Mrs. Anderson and Louisa left he introduced Mealey to the household, and that he himself borrowed that day of Mrs. Higgins $135.00, which he has since paid.

Mealey testifies that he works for Martin, that Martin owed him a "couple of dollars," and that he accompanied Martin to Mrs. Higgins, who said he was going there to get some money to pay him; that Martin left witness on the front steps and went into the house alone; that he did not then and "don't to-day know Mrs. Higgins from Mrs. Anderson;" that whilst waiting for Martin the latter came out and said to him, "You are just in time, if you have no objections come in for a moment and be a witness to this paper;" that he went in and saw some money on the table, but how much he cannot state; that Mrs. Mooney said to

434

Mrs. Anderson, "are you going to sign this?" to which Mrs. Anderson said: "I can't write, I am too excited;" that he does not know whether Mrs. Anderson wrote her name or made her mark, but that she said: "I am too excited to write, but I will do the best I can;" that he saw Mrs. Anderson take the pen in her hand and put it on the paper, but does not know whether she "made her name or a cross." He saw this action by Mrs. Anderson but once; that she had the pen in her hand when he came in, but whether "she signed her full name as Mrs. Anderson or Mrs. So and So," to quote his language, he could not say. That he only signed as a witness to the endorsement, although the endorsement was made before he signed as a witness and he does not remember whether he signed as a witness to a signature or a cross mark; that he remained in the room some five minutes after the event related and the money still remained on the table as he had seen it when he entered; that he was introduced to the "old lady," whom Mrs. Mooney, the plaintiff, said was Mrs. Anderson, by Mrs. Mooney, but he declines to swear that it was in fact Mrs. Anderson; that returning to the front door steps after remaining in the house about five minutes, he remained there about an hour before Martin came out; that when Martin did come out he handed him (Mealey) a ten-dollar bill, telling him to take seven dollars out of it; that after Mrs. Anderson's death he met Martin, who said he was invited to the office of the attorney for the defendant to look at a photograph of a lady, and "I went there and recognized the photograph as the lady" whom he had been introduced to as Mrs. Anderson.

It is on this testimony, which we have given substantially, that the affirmance of the judgment is asked.

We do not wish to characterize the testimony as other than conflicting and unsatisfactory, and as falling far short of establishing with legal certainty the plaintiff's claim, although there is much in it to make us regard it with suspicion. Having failed

435

to prove her case the judgment must be reversed and plaintiff's case dismissed as in case of non-suit.

It is therefore ordered, adjudged and decreed that the judgment appealed from be and the same is hereby avoided, set aside and reversed, and plaintiff's suit is dismissed as of non-suit.